[No. B114533. Second Dist., Div. Four. Jan. 5, 1999.]

FOOTHILL VILLAGE HOMEOWNERS ASSOCIATION et al., Plaintiffs and Respondents, v.
GORDON H. BISHOP, as Trustee, etc., et al., Defendants and Respondents;
LAWRENCE FIRST, Defendant and Appellant.

## COUNSEL

Schimmel, Hillshafer & Loewenthal, Robert D. Hillshafer and Glenn T. Rosenblatt for Defendant and Appellant.

Christopher E. Chenoweth and Leland Chan for California Bankers Association as Amicus Curiae on behalf of Defendant and Appellant.

Alan M. Insul for Defendants and Respondents.

No appearance for Plaintiffs and Respondents.

## OPINION

**VOGEL (C. S.), P. J.—**

### INTRODUCTION

This case involves a condominium complex for which the homeowners association purchased earthquake insurance. The insurer paid more than $2 million for earthquake damage to the complex. Because the complex was severely damaged, the homeowners voted not to rebuild. The issue raised by this appeal is the distribution of the earthquake insurance proceeds. Does the money go to the lender or to the individual owners? Citing this division's decision in *Ziello* v. *Superior Court* (1995) 36 Cal.App.4th 321 [42 Cal.Rptr.2d 251], which held that a lender did not have a right to share in the proceeds of a policy purchased by the owner of a single-family residence because the lender did not require earthquake insurance as a condition of the loan agreement, the homeowners contend the money belongs to them. The lender, on the other hand, relies upon various provisions in the deed of trust and attached condominium rider as well as the conditions, covenants, and restrictions (CC&R's) to argue that the homeowners, through their association, agreed that the proceeds would be disbursed subject to the interests of the lender(s). All of the lender's arguments, however analyzed, fail for the same reasons: the lender never required the purchase of earthquake insurance and the lender never explicitly included in any of the loan documents a

provision for it to share in the proceeds of any earthquake insurance. The order appealed from is, therefore, affirmed.

### FACTUAL AND PROCEDURAL BACKGROUND

Foothill Village Townhomes is a 22-unit condominium complex in Sylmar, originally constructed in 1980. The Foothill Village Homeowners Association (Association) is a nonprofit mutual benefit corporation responsible for the management of the complex pursuant to a recorded declaration of CC&R's, the articles of incorporation, and bylaws.

In January 1994, the Northridge earthquake caused substantial damage to more than three-fourths of the complex. All residents were required to move out.

At that time, Glen and Judith Neally (the Neallys) owned unit 5; Henry and Yvette Woolston (the Woolstons) owned unit 7.[1] At the time they purchased their units, their lenders did not require either the borrowers or Association to obtain earthquake insurance.

Earthquake insurance issued by State Farm Fire and Casualty (State Farm) and purchased by Association was in effect when the Northridge earthquake struck. Association was the named insured on the policy. Eventually, State Farm paid Association in excess of $2 million pursuant to that insurance.

Two years after the earthquake, Lawrence First (First) purchased, through a foreclosure proceeding, one of the units (unit 10) in the complex. This purchase gave First the status of a homeowner and permitted him to participate in subsequent proceedings in which the homeowners evaluated their options vis-à-vis the earthquake.

In May 1996, Association's board of directors called for a vote of the owners of the 22 units to decide how to proceed in the wake of the destruction caused by the earthquake. Two options were presented. The first was to use the insurance proceeds to rebuild the complex, a process which would take 10 to 18 months to complete. In the event the funds provided by State Farm were insufficient, a special assessment would be levied against all owners. The second option was to sell the complex as a whole (all units) and "as is." The sale proceeds and the insurance proceeds from State Farm

---

[1]The Neallys had purchased their unit in 1988 and had refinanced their loan in 1992 so that at the time of the earthquake it was subject to a first trust deed. The Woolstons had purchased their unit in 1991. Because they never refinanced, the property was still encumbered by the original purchase money trust deed at the time of the earthquake, thereby giving the Woolstons the protection of the antideficiency judgment statute. (Code Civ. Proc., § 580b.)

would be distributed to individual owners. A May 1996 letter from Association to the owners explained that before the proceeds would be distributed, there would first be an "allowance for costs (legal and accounting fees, outstanding assessments not paid by insurance, costs of transactions, etc.) and encumbrances." Another portion of the letter indicated the sale and insurance proceeds would be distributed "after allowance for . . . claims by lenders and other lienholders against the proceeds."

In June 1996, the owners, including First, the Neallys, and the Woolstons, voted unanimously *not* to rebuild. The owners authorized Association to negotiate a "bulk sale" of the entire complex.

In July 1996, First purchased from the Federal Home Loan Mortgage Corporation (Freddie Mac) the assignments of loans on five units in the complex. The consideration furnished by First for the assignment of each mortgage was *$1*. The purchase included the loans on units 5 and 7, owned respectively by the Neallys and the Woolstons. Each loan had gone into default one month after the earthquake.[2] At some later time First initiated but then abandoned nonjudicial foreclosure proceedings against all five units.

On July 29, 1996, Association filed an action for partition and sale of the complex. It named as defendants all of the owners and lenders, including First. To a large extent, the action was a protective measure in the event some of the owners and/or lenders failed to comply with the terms of the proposed "bulk sale" of the complex. In part, the action sought an order that the sale proceeds be held in escrow and then distributed to the parties pursuant to the CC&R's.

At Association's next annual meeting held in September 1996, First was elected to the board of directors. The new three-person board adopted a resolution that Association would send a letter to the mortgagees requesting the mortgagees to tender a written demand for payment of the insurance proceeds if they wanted those funds. If such a demand were forthcoming, the insurance proceeds would be directly paid to the mortgagee to the extent of the loan balance and any remaining funds would be paid to the unit owner. If the mortgagee did not respond in a timely manner, Association would issue a check payable jointly to the lender and owner.

That same month (September 1996) Association reached an agreement to sell the entire complex in a "bulk sale" to a developer for reconstruction. The

---

[2]At the time of First's purchase, the principal balance on the Neallys' mortgage was $91,639.83 plus accrued interest and, on the Woolstons's mortgage, the principal balance was $110, 183.10 plus accrued interest.

sale would result in a distribution of approximately $25,000 to each unit. The sale required the lenders whose interests were secured by deeds of trusts on the individual units to release their lien interests in return for their pro rata share of the sale proceeds. To the extent that the sale proceeds were insufficient to repay the note, it was contemplated the lenders would accept short payoffs without further obligation except to the extent a note was secured by additional collateral. Association's attorney contacted the individual lenders to explain this plan.

In October 1996, First submitted a demand to Association that it pay to him the insurance proceeds on the five units upon which he now held the mortgages, including the units owned by the Neallys and the Woolstons. Association paid him $60,000 per each unit. First, as a member of Association's board of directors, cosigned the check to himself.[3]

In February 1997, counsel for the Neallys and the Woolstons demanded that First return to them the $60,000 insurance proceeds he had received for their respective units and that First withdraw any future claim for additional earthquake insurance proceeds. They claimed First had "wrongfully obtain[ed] these funds" because he had acted as a director of Association "on matters in which [he] had a pecuniary stake beyond that of a mere unit owner[,] . . . utiliz[ing] [his] dual fiduciary position as a lender and board member for impermissible self-gain."[4]

First responded that the CC&R's provided that, as a mortgagee, he had a right to the funds.

Thereafter, State Farm made an additional payment to Association based upon the earthquake policy, resulting in an allocation of another $30,000 for each unit. Association, however, did not distribute this amount to First for the units owned by the Neallys and the Woolstons but instead retained the funds pending resolution of the competing claims.

In early April 1997, Association sought judicial relief in regard to the sale of the two units owned by the Neallys and the Woolstons. Association

---

[3]First signed a receipt which acknowledged, in part: "[T]hese funds are being distributed to me pursuant to the Resolution adopted by the Board of Directors to distribute an allocation of $60,000.00 to each record unit owner from earthquake insurance proceeds, in light of the Association's decision not to rebuild the Property. [¶] . . . [T]hese funds have been distributed to me on behalf of the record owners of the Units in partial satisfaction of the mortgage interests identified in the Assignment of Mortgage Interest attached hereto, and that each of the five mortgage interests shall be credited and partially satisfied in the amount of $60,000 . . . ."

[4]The record does not indicate if the owners of the other three units on which First held mortgages and for which First collected the insurance earthquake proceeds demanded that he return those proceeds to them.

claimed that First, as the owner of the notes on those two units, refused to take the steps necessary to consummate the sale. First's intransigence threatened to derail the "bulk sale" of the complex because the developer sought to purchase the property in its entirety in one transaction. Association made clear that it was *not* concerned with the issue of who, as between First and the Neallys and the Woolstons, was entitled to the earthquake insurance proceeds.

On April 21, 1997, the superior court issued an order that First, the Neallys, and the Woolstons "immediately execute any and all documents and instruments reasonably necessary to effect the conveyance of Units 5 & 7 . . . ." Immediately thereafter, the parties executed a stipulation implementing that order. Insofar as is pertinent to this appeal, the stipulation noted that First contended he had "certain contractual rights to earthquake insurance proceeds (whether distributed or not) pursuant to the CC&Rs which were and are in addition to his rights as a secured lender (a contention [the] Neally[s] and [the] Woolston[s] dispute)" and that none of the parties waived their rights to those proceeds by executing the stipulation.[5] The stipulation recited Association would retain the earthquake insurance proceeds until ordered to disburse the monies by the court.[6]

In May 1997, when the close of escrow on the "bulk sale" of the condominiums was imminent, the Neallys and the Woolstons moved for an order requiring First to pay them the $120,000 earthquake insurance proceeds he had received in October 1996 from Association. In addition, they obtained a temporary restraining order to prevent disbursement to First of his share (approximately $150,000) of the sale proceeds on the one unit he owned and the five units upon which he held the mortgages on the basis that it was necessary to preserve a source of funds in the event they prevailed on their claim that First had wrongfully obtained their $120,000 earthquake insurance proceeds.

On the merits of their claim for the earthquake insurance proceeds, they argued that because First had no secured interest in the money, the money belonged solely to them so that his acquisition of the funds was wrongful. Noting that their respective lenders had never required the acquisition of earthquake insurance, they relied upon this division's opinion in *Ziello* v. *Superior Court, supra,* 36 Cal.App.4th 321, which had held that in the context of a mortgage upon a single-family dwelling, the earthquake insurance proceeds belonged to the homeowner, not to the lender, because the

---

[5]The stipulation further recited that First agreed he would "not seek any claim for deficiency judgment or unsecured claim against either Neally or Woolston."

[6]Following entry of the stipulation, the court vacated its April 21, 1997, order.

lender had never required the owner to acquire earthquake insurance. They urged the superior court had jurisdiction to resolve this dispute in the context of the partition action initiated by Association. (See Code Civ. Proc., §§ 872.010 through 872.840.)

First's opposition did not contest the trial court's authority to adjudicate the issue. First attacked the owners' claim on the merits, advancing two arguments as to why he had the right to the insurance proceeds, the details of which will be set forth, *post*. At this point, we simply note that the first argument was based upon an interpretation of the CC&R's and the second was based upon an interpretation of the deed of trust and attached condominium rider executed, respectively, by the Neallys and the Woolstons. First urged that our opinion in *Ziello* was inapposite because of the nature of a condominium project.

Association filed a "statement of non-opposition" to the claims made by the Neallys and the Woolstons.[7]

In July 1997, the court found in favor of the Neallys and the Woolstons. The court ordered First to pay $60,000 each to the Neallys and the Woolstons (plus interest accrued since February 1997 when they demanded return of the money). Because the "bulk sale" to the developer had been completed, the court directed the monies be paid from the net sale proceeds attributable to the one unit First owned and the five units upon which he held the mortgages. The court ordered Association to pay $30,000 each (with accrued interest) to the Neallys and the Woolstons, representing the second earthquake payment made by State Farm to Association.

Seven weeks after filing a notice of appeal from the trial court's order, First filed a petition for writ of supersedeas which this division summarily denied.

During pendency of this appeal, California Bankers Association applied to file an amicus curiae brief in support of First. We granted the application.

DISCUSSION

First advances several arguments as to why he is entitled to the earthquake insurance proceeds, none of which has merit.[8]

---

[7]Association has filed a document stating its intent not to participate in this appeal.

[8]First also attacks the trial court's order restraining distribution to him of the sale proceeds on the units in which he possessed an interest. He claims this order was an abuse of discretion

### 1. *First Cannot Rely Upon the Deed of Trust and Condominium Rider to Claim the Earthquake Insurance Proceeds*

Each deed of trust executed by, respectively, the Neallys and the Woolstons required the borrowers to insure the property "against loss by fire, hazards included within the term 'extended coverage' and *any other hazards for which Lender requires insurance.*" (Italics added.) It further provided that "[i]f the restoration or repair is not economically feasible . . . , the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due . . . ."

The same day the deeds of trust were executed, the borrowers executed a "Condominium Rider" which was attached to and incorporated into their respective deeds of trust. The document waived the deed of trust requirement that the borrowers maintain fire and hazard insurance "[s]o long as the Owners Association maintains . . . a 'master' or 'blanket' policy on the Condominium Project which is satisfactory to Lender and which provides insurance coverage . . . *against the hazards Lender requires,* including fire and hazards included within the term 'extended coverage.' . . . [¶] In the event of a distribution of hazard insurance proceeds in lieu of restoration or repair following a loss to the Property, whether to the unit or to common elements, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender for application to the sums secured by the Security Instrument, with any excess paid to Borrower." (Italics added.)

Our decision in *Ziello* v. *Superior Court, supra,* 36 Cal.App.4th 321 (hereafter *Ziello*), disposes of First's contention that these documents created any right on behalf of the lender to share in the earthquake insurance proceeds. In *Ziello,* the lender required the homeowner to obtain insurance against fire and extended coverage hazards and any other hazards for which the lender required insurance. The lender did *not* require earthquake insurance. The homeowner obtained the required insurance and the lender was included as a loss payee. Thereafter, the homeowner added, on her own initiative and at her own expense, earthquake coverage. Without consulting the homeowner, the insurer added the lender as a loss payee on the earthquake coverage. Six years later, the Northridge earthquake caused serious damage to the home. The homeowner presented a claim which the insurer honored on the condition that its check be jointly payable to her and the lender. The homeowner asked the lender to endorse the check to her. The

---

because, after filing his notice of appeal, he posted an appeal bond. This was the very claim we rejected when we denied First's petition for a writ of supersedeas. Because we will now affirm on the merits the trial court's decision in favor of the Neallys and the Woolstons, this claim is essentially moot. As such, there is no need to revisit it.

lender refused, claiming it had the right to control the earthquake proceeds and that it could require that the proceeds be applied either to repair the property or to reduce the unpaid loan balance. The homeowner filed a declaratory relief action.

To support its claim for the earthquake insurance proceeds, the lender relied upon the homeowner's contractual obligation to obtain fire and extended coverage hazard insurance and the parties' agreement that insurance proceeds would be applied either to repair the property or to reduce the debt if repair were not economically feasible. We found this argument to be unpersuasive. We held: "It is undisputed that lender did not require borrower to obtain insurance against earthquake damage. Since earthquake insurance was not required by the deed of trust, it is not a type of insurance described [in the parties' contract]. The agreement of the parties regarding the proceeds of required insurance has no application to proceeds of additional insurance borrower chose to obtain for her own benefit." (*Ziello, supra,* 36 Cal.App.4th at p. 327.) In other words, ". . . there was no requirement to procure earthquake insurance, nor any broad provision as to the application of *all* insurance proceeds (whether required or not) to repair or reduce indebtedness." (*Id.* at p. 329, italics in original.)

*Ziello* is factually identical insofar as First would rely upon the deed of trust to claim the earthquake proceeds. In both cases, the lender required the borrower to obtain fire insurance. In addition, the deed of trust compelled the borrower to purchase insurance for "hazards included within the term 'extended coverage' and any other hazards *for which Lender requires insurance.*" (Italics added.) Each deed of trust provided that were restoration or repair not economically feasible, the insurance proceeds would be applied to the obligation secured by the deed of trust. In each case, the lender did *not* require the borrower to obtain earthquake insurance. In *Ziello,* we concluded that the lender's failure to require earthquake insurance meant that the lender was not entitled to proceeds of that insurance. By a parity of reasoning, First cannot rely upon the deed of trust in this matter.

Furthermore, First cannot rely upon the Condominium Rider attached to the deed of trust. That document did no more than recognize the practical reality that since the loan was being made on an individual condominium unit, it was only feasible for Association to assume the responsibility for maintaining in force fire insurance and whatever other hazard insurance the lender required as a condition of the loan agreement, in lieu of the individual borrower.

Although the deed of trust in both *Ziello* and this case includes the requirement of obtaining insurance against loss by hazards included within

the term "extended coverage," that provision does not aid First. "A typical extended coverage endorsement provides that the policy is extended to the insured to insure against direct loss by various other risks." (3 Cal. Insurance Law & Practice (1995) Property Insurance in General, § 35.05[6], p. 35-21.) Examples of extended coverage include loss caused by earthquake, windstorm, flood, gas explosions, or riots. (*Id.* at pp. 35-21 to 35-22.) Thus, while earthquake coverage fits comfortably within the ambit of the phrase "extended coverage," the relevant provision in the deed of trust must be read in context, particularly in light of the italicized language: "[H]azards included within the term 'extended coverage' and any other hazards *for which the Lender requires insurance.*" (Italics added.) This means the borrower has no obligation to obtain endorsements for *any* extended coverage *unless* required to do so by the lender. Absent the lender imposing such a requirement, the lender has no claim to the proceeds generated by the extended coverage insurance. In other words, the provision merely grants the lender a right to the insurance proceeds generated by the policies, including endorsements for extended coverage, that it *requires* the borrower to obtain. A contrary interpretation would require the borrower to obtain endorsements to cover all contingencies embraced within the concept of "extended coverage." Such an interpretation would be unreasonable because it would create open-ended liability of the borrower to purchase any and all insurance. The lender requires insurance to protect the security (real property) given for the loan. It is therefore the lender's responsibility to clearly identify the coverage required, including that falling within the category of extended coverage. Here, the lenders only specified fire insurance.

Lastly, First cannot rely upon the following provision of the Condominium Rider which, after identifying the individual unit being purchased, states: "The Property includes a unit in, together with an undivided interest in the common elements of, a condominium project known as [Foothill Village Townhomes]. If the owners association . . . holds title to property for benefit or use of its members or shareholders, the Property also includes Borrower's interest in the Owners Association and the uses, proceeds and benefits of Borrower's interest." First claims that this provision grants the lender a secured interest in any asset owned by Association and that one such asset was State Farm's payment on the earthquake policy. The claim is meritless. As will be explained later in more detail, Division Two of this district has already held in the context of another lawsuit arising out of this same condominium complex that Association held the insurance proceeds solely as a trustee for the individual owners. (*Countrywide Home Loans, Inc.* v. *Tutungi* (1998) 66 Cal.App.4th 727, 732 [78 Cal.Rptr.2d 203], including fn. 6.) This means that the money was *not* a corporate asset beneficially owned by Association. Therefore, First may not rely upon this provision,

which merely granted the lender additional security in the form of the individual owner's interest in the corporate assets of the homeowners association charged with the responsibility of managing the complex.

## 2. *First Cannot Rely Upon the CC&R's to Claim the Earthquake Insurance Proceeds*

Article Nine of the CC&R's is entitled "Protection of Lenders; Rights of Mortgagee." Section 9.02, subdivision (f) provides that unless 75 percent of the lenders give written approval, neither Association nor the individual owners can "[u]se hazard insurance proceeds for losses to any of the properties within the Project (whether to Units or to the Common Area) for other than the repair, replacement or reconstruction of such improvements, except as provided by statute in case of substantial loss to the Units and/or Common Area of the Project."

Article Ten of the CC&R's governs Association's acquisition of insurance. When Association obtains insurance in its role as an agent for the owners (§ 10.01), Association is to have named as insureds various entities and individuals, including "all Owners and their Mortgagees as their interests may appear." (§ 10.02.) This provision covers both fire insurance and "other risks covered by the standard extended coverage endorsement" as well as "[s]uch other risks, perils or coverage as the Association may determine." Any policy so acquired "should, if economically practical and available at reasonable premiums also . . . (xii) provide that all insurance proceeds under said master policy shall be payable to the Association as trustee to be held and expended as provided in this Declaration *for the benefit of the Owners and their respective mortgagees as their interests may appear.*" (Italics added.)

Article Eleven of the CC&R's is entitled "Damage or Destruction; Rebuilding." Section 11.04 addresses the situation when the insurance proceeds are insufficient to cover the cost to rebuild and Association votes instead "to distribute the insurance proceeds available for such reconstruction . . . to the Owners . . . but *subject to the rights of Mortgagees holding Mortgages encumbering Condominiums within the Project . . . .*" (Italics added.)

The nub of First's appeal is the claim that, read together, several provisions of the CC&R's give a lender the right to share in the earthquake insurance proceeds. First argues that *Ziello* is distinguishable because this case involves a residential condominium development as opposed to a single family residence. This is also the position advanced by amicus curiae.

The argument takes the following approach. Prudent lenders review CC&R's before making loans to individual buyers in condominium complexes. The lenders rely upon the CC&R's, which are recorded, in making

**1376**

their lending decision. According to amicus curiae, provisions in the CC&R's "are enforceable extensions of individual loan documents."

First relies upon the provisions that regardless of the type of risk insurance obtained, Association holds those insurance proceeds as trustee for the benefit of the owners and their mortgagees (§ 10.02); that if Association votes not to rebuild but to distribute the insurance proceeds, it does so subject to the rights of the mortgagees (§ 11.04); and that absent lender approval, insurance proceeds can only be used to repair (§ 9.02, subd. (f)). Essentially, First urges these provisions grant the lender a secured interest in insurance proceeds regardless of the particular type of hazard. In other words, whatever benefits inure to an individual homeowner as a result of insurance purchased by Association, a lender has a right to claim those proceeds to the extent necessary to extinguish the debt owed. First also points to the provision of the Condominium Rider which states that a borrower shall perform all of its obligations created by the condominium complex's "constituent documents" (e.g., CC&R's) which, according to First, give the lender a right to share in the earthquake proceeds.

Along this line, attached to the amicus curiae brief is an October 1998 memo from the California Earthquake Authority which recognizes that given the holding of *Ziello*, a mortgagee has no right to control earthquake insurance proceeds unless express language in the loan documents either (1) assigns to the mortgagee those loan proceeds regardless of whether the insurance was required as a condition of the loan; or (2) gives to the mortgagee the right to share, control, or direct those loan proceeds whether or not the insurance was required.[9] Here, of course, there was no such *express* language in the loan documents but amicus curiae's position is that the CC&R's are the functional equivalent of such language.

This argument lacks merit because it was neither intended nor reasonably contemplated that the CC&R's in this case would give a lender the right to *earthquake insurance proceeds.* For one thing, the CC&R's were adopted in 1980. At that time, there was no state law even requiring an insurer to offer residential earthquake insurance. It was not until four years later, in 1984, that the Legislature enacted Insurance Code section 10081 et seq. *requiring* an insurer that offers residential homeowner insurance to *also offer* earthquake insurance. Furthermore, that statutory requirement has been interpreted to mean that an insurer has *no obligation* to offer to a homeowners association earthquake insurance in tandem with a master policy on a residential condominium complex. *(Marina Green Homeowners Assn.* v. *State Farm Fire & Casualty Co.* (1994) 25 Cal.App.4th 200 [30 Cal.Rptr.2d

---

[9]Amicus curiae's request that we take judicial notice of this document is granted.

364].) Thus, at no point did Association ever have the right to compel an insurer to sell it earthquake insurance. Consequently, it is unreasonable for First (or amicus curiae) to argue that the CC&R's were drafted and executed to give a lender *any* interest in earthquake proceeds because there was never any assurance (let alone requirement) Association could obtain earthquake insurance. Furthermore, First has offered no evidence that the original lenders interpreted and relied on the CC&R's in the manner now urged by First and amicus curiae when those lenders approved the loans subsequently assigned to First.[10] In other words, amicus curiae's claim that a lender (such as First) had a "legitimate expectation" based upon the CC&R's to share in the earthquake insurance proceeds has no factual basis.

Furthermore, those portions of the CC&R's which provide that Association holds any insurance proceeds as trustee "for the benefit of the Owners and their respective mortgagees as their interests may appear" and "subject to the rights of the Mortgagees encumbering Condominiums within the Project" must be read in tandem with the loan agreement, in particular the deed of trust and Condominium Rider the lender (mortgagee) required the borrower to execute. That is, the CC&R's do nothing more than recognize and implement a lender's right to insurance proceeds. The point that First overlooks is that the lender's right to insurance proceeds is created by the loan agreement. To use the parlance of the CC&R's, the mortgagee's interests and rights are defined and created by the loan documents. If those documents required the acquisition of earthquake insurance, then the provisions of the CC&R's set forth above simply recognize that reality: to wit, that Association holds those proceeds for the lender's benefit. Here, as explained above, the lender did not require earthquake insurance. Consequently, these provisions in the CC&R's cannot be read to create a right which does not otherwise exist.

Simply stated, the lender could have protected itself by either requiring earthquake insurance or inserting *in the loan documents* express provisions giving it a secured interest in *any* insurance proceeds without limitation. Some lenders do impose such requirements. For instance, since 1995, Freddie Mac has required certain California condominium projects to obtain earthquake insurance before it will purchase the individual mortgages on the units. (Cal. Condominium and Planned Development Practice (Cont.Ed.Bar Supp. 1998) § 5.24, pp. 168-169.) Section 9.23 of the CC&R's, entitled "Insurance Required by Lenders" speaks to that situation. It provides: "The Owners and the Association shall procure and maintain fire and liability insurance and such other insurances as *may from time to time be required by*

---

[10]The record does not indicate when Association obtained from State Farm the earthquake policy in force at the time of the Northridge earthquake.

*Lenders.* All such insurance shall contain loss payable clauses naming the Lenders, as their interests may appear." (Italics added.) In this case, however, the lender did not require earthquake insurance. It is not the court's responsibility to correct the lender's omission by rewriting nunc pro tunc the pertinent documents.

3. *Countrywide Home Loans, Inc. v. Tutungi, supra, 66 Cal.App.4th 727, Does Not Support First*

First claims that *Countrywide Home Loans, Inc.* v. *Tutungi, supra,* 66 Cal.App.4th 727 (hereafter *Countrywide*) supports his position. He is wrong. In fact, careful examination of that opinion demonstrates that it supports our analysis.

*Countrywide* involved the same condominium complex as does this case: Foothill Village Townhomes. In *Countrywide,* a declaratory relief action was initiated to determine conflicting claims to earthquake insurance proceeds. On the one side was Countrywide Home Loans, Inc. (Countrywide), that in 1992 had funded the borrowers' acquisition of unit 21. In July 1995, a year and a half after the Northridge earthquake, Countrywide acquired ownership to unit 21 through a nonjudicial foreclosure. Countrywide therefore became a member of Association.

After Association decided in May 1996 not to rebuild but to instead distribute the earthquake insurance proceeds to the owners of the units, a dispute arose between Countrywide and the former owners of unit 21 upon whom Countrywide had foreclosed.

The Court of Appeal determined the money belonged to Countrywide in its capacity as an owner of a unit. Insofar as is relevant to this case, the appellate court made the following points. The first was that while it was true that CC&R's required the policy to name as the insureds the owners of the units and their mortgagees (66 Cal.App.4th at p. 730, fn. 2), the sole named insured was "Foothill Village Townhomes." (*Id.* at p. 730.) Because the CC&R's specifically provided that the policy proceeds were payable to Association as trustee (*id.* at p. 732, including fn. 6), Association held "the policy for the benefit of the owners, to enable them to obtain repair or recompense, through association." (*Id.* at p. 732, fn. omitted.) The appellate court concluded: "[Countrywide], having succeeded to borrowers' position as unit owner and member of the association, . . . is entitled to share in the insurance proceeds with the other owner-members, just as it would have shared in their use to repair the project had the members elected that option." (*Id.* at p. 733.)

In light of the above, it is apparent that First errs when he claims that *Countrywide* establishes the lender's right to the earthquake insurance proceeds. It, in fact, establishes the opposite: the owner's right to those proceeds. The case did not involve, as here, a conflict between the owner and the lender; it involved a conflict between the present owner and the previous owner. The fact that Countrywide, the present owner, had initially been the lender was irrelevant; the dispositive point was that Countrywide claimed the proceeds in its capacity as an owner, having obtained that status through a foreclosure proceeding.

To a certain extent, First attempts to avoid the force of this conclusion by arguing that this distinction unfairly penalizes a lender like himself who chose not to foreclose. He argues that it is unfair that Countrywide, which carried through on the foreclosure proceeding to become the owner of a unit, is entitled to share in the earthquake insurance proceeds but that he, who initiated but then abandoned nonjudicial foreclosure proceedings, is barred from sharing in the earthquake insurance proceeds. The argument is unavailing. First simply made the business decision to abandon nonjudicial foreclosure proceedings. While in hindsight that decision did not inure to First's benefit, the point is that he made the decision and must live with its consequences.

First also errs in claiming that *Countrywide* supports his argument that the CC&R's establish his right as lender to share in the earthquake insurance proceeds. To the extent that *Countrywide* analyzes the legal significance of the CC&R's, it is in the context of explaining that the document provides that Association holds the proceeds as a trustee *for benefit of the owners.*[11] (64 Cal.App.4th at pp. 732-733.) This discussion led to the court's conclusion: "[Countrywide], having succeeded to borrowers' position as unit owner and *member of the association,* it is entitled to share in the insurance proceeds with the other owner-members . . . ." (*Id.* at p. 733, italics added.)

---

[11]For that reason, First mistakenly relies upon the italicized phrase contained in the following statement of facts in the *Countrywide* opinion: "However, the [insurance] proceeds were not sufficient [to rebuild], and it therefore fell to the association's membership, under the CC&R's, to decide whether to proceed with repairs by special assessment or not to do so, and instead distribute the insurance proceeds to the owners, proportionally, *subject to the rights of any mortgagees.*" (*Countrywide, supra,* 66 Cal.App.4th at p. 730, italics added.) First argues that the italicized phrase indicates that the *Countrywide* court recognized and held that the CC&R's give a lender a right to share in the earthquake insurance proceeds. Not so.

For one thing, that issue was not directly presented to the appellate court. "A case is not authority for a proposition not considered therein. [Citations.]" (*Valley Crest Landscape, Inc. v. City Council* (1996) 41 Cal.App.4th 1432, 1439 [49 Cal.Rptr.2d 184].)

For another thing, the italicized phrase can be interpreted to simply mean that the money would be disbursed subject to whatever rights a lender had already established. As so interpreted, the phrase does not aid First because, as explained above, neither the loan agreement nor the CC&R's gave the lender the right to share in earthquake insurance proceeds.

### 4. *First Cannot Rely Upon the June 1996 Vote Not to Rebuild to Support His Claim for the Earthquake Insurance Proceeds*

On this appeal, First raises for the first time the following two-pronged argument.

First underscores that before the homeowners voted in June 1996 not to rebuild and before he purchased the five mortgages in July 1996, a May 1996 letter from Association stated that the sale and insurance proceeds would be distributed to the individual owners after "payment of expenses, liens and encumbrances." Essentially, First claims that in making his decision to purchase the mortgages, he relied upon the representation that a lender would share in the earthquake insurance proceeds and that all of the homeowners, including the Woolstons and the Neallys, by voting not to rebuild irrevocably agreed that the mortgagees would share in those insurance proceeds.

■ To the extent First is claiming detrimental reliance, we need not address the merits of this proposition because First never raised this theory in the trial court. First's opposition to the motion filed by the Neallys and the Woolstons raised only the legal theories we have already discussed: that the deed of trust, Condominium Rider, and the CC&R's, either singularly or collectively, granted a lender a right to the earthquake insurance proceeds. First never argued or offered evidence of this theory of detrimental reliance which appears to be based upon the doctrine of promissory estoppel. This, by necessity, is a fact-based inquiry requiring resolution of such issues as the reasonableness of First's reliance and the foreseeability of such reliance. (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 248, pp. 249-251.) First's failure to allege and substantiate this theory in the trial court precludes him from raising it for the first time on appeal. (See *Frank Pisano & Associates* v. *Taggart* (1972) 29 Cal.App.3d 1, 18 [105 Cal.Rptr. 414].)

■ To the extent First raises the legal argument that the June 1996 vote constituted an irrevocable decision to distribute the earthquake insurance proceeds to the mortgagees, we will exercise our discretion to consider the argument. (See, e.g., *Yeap* v. *Leake* (1997) 60 Cal.App.4th 591, 599, fn. 6 [70 Cal.Rptr.2d 680].) Our reason is twofold: the underlying facts are undisputed, and the need to bring closure to this litigation.

The record does not support First's characterization of the June 1996 vote. The ballot contains no mention of any intent to distribute the earthquake

insurance proceeds to mortgagees.[12] The ballot did no more than authorize sale of the complex, either in a "bulk sale" on an individual basis, with disbursement of the proceeds subject to whatever valid claims existed on each unit.

As for Association's May 1996 letter, it simply advised that the sale and insurance proceeds would first be used to pay expenses, liens, and encumbrances. Nothing in that letter indicated that any lender had a legitimate claim to share in the earthquake insurance proceeds. The letter merely gave notice to the individual owner that his or her share of the sale and insurance proceeds would first be used to pay any valid or legitimate claims against the individual unit. The letter puts no imprimatur upon any particular claim. Whether a specific claim was valid would depend upon the particular facts, including the agreement(s) between the unit owner and the lender. As explained above, neither the deed of trust, the Condominium Rider, nor the CC&R's granted a lender a right in the earthquake insurance proceeds owned by the Neallys and the Woolstons. As such, neither Association's May 1996 letter nor the homeowner's vote which followed in June 1996 gave a lender a right to those proceeds because that right was not otherwise already provided for or created.[13]

We therefore reject First's argument that the June 1996 vote constituted an irrevocable decision to distribute the insurance proceeds to lenders, a decision which he claims the Neallys and the Woolstons improperly attempted to

---

[12]The ballot states: "I vote in favor of selling the Property and authorizing the Board either to bring an action for partition in the appropriate court on my behalf, and to cause an order for a sale of the Property for at least $22,500 per unit, free of all liens and encumbrances, or in the alternative, to effect a sale of my condominium unit on an individual basis and further agree to authorize the Board to act in the manner set forth in Option 2 of the May 20, 1996 letter. I further understand that the Board will be empowered by this affirmative vote to act to cause a sale under the provisions of the California Civil Code § 1359 pertaining to partition actions, including all appropriate action to effect such sale."

The "Option 2" referenced in the ballot was explained in the May 1996 letter from Association. As already noted above in the text, that option stated, in part: "The combined [sale and insurance] proceeds will be divided by the number of units and distributed to Owners after allowance for costs (legal and accounting fees, outstanding assessments not paid by insurance, costs of transactions, etc.) and encumbrances." Another paragraph utilizes a hypothetical sale price per unit and concludes: "The remaining balance after payment of expenses, liens, and encumbrances will be distributed to individual owners."

[13]First also points to an April 1996 letter from counsel for Association to two members of the board of directors stating counsel's belief (unsupported by any legal authority) that the lenders had a claim to the insurance proceeds. Shortly thereafter and before Association sent the May 1996 letter to the individual homeowners, Association terminated that particular law firm's services. As there is no indication in the record that any homeowner read the April 1996 letter before the June 1996 vote, the letter has no impact on First's argument that the June 1996 vote resulted in an irrevocable election by the homeowners to distribute earthquake insurance proceeds to lenders.

unwind when they filed motions demanding First return the earthquake insurance proceeds owed to them.

DISPOSITION

The order appealed from is affirmed.

Epstein, J., and Hastings, J., concurred.

A petition for a rehearing was denied January 26, 1999.